112, 25, 22, Douglas, Mumuir v. Technical Packaging Good morning, your honors. Martin Spiegel on behalf of the Appellate Pact of Appellate Pact. Mr. Stieber, this is our appeal from the decision of the Circuit Court of Cook County, which in part reversed the decision of the Illinois Workers' Compensation Commission. The commission had decided that Mr. Longmuir had failed to prove that he was permanently and totally disabled, that he had failed to prove he was entitled to a waste differential and awarded him 50 percent loss of use of a person. The Circuit Court reversed that decision in part and found that he was entitled to a waste differential and specified a specific amount. For some brief background on this case, I'm not going to go through all the facts of it, but I think it's important that you understand some of the history. The accident occurred December 11, 1994, and the case was actually filed before the commission on February 13, 1995. To add further context as to why we're here for the first time before you 19 years later, we've had at least three arbitrators involved in the case. It's been argued at the commission level at least three times. It's been to the Circuit Court at least two times. And frankly, my client's on his fourth name since this case started. We're dealing with a right-foot case with chronic pain and depression. In its decision of December 22, 2008, the commission ordered us to provide vocational rehabilitation to Mr. Longmuir. The voc specialist concluded that Mr. Longmuir was capable of doing sedentary entry-level type work. Now, this entire vocational process, which essentially was only four months in length, was limited by Longmuir. He was scheduled on numerous occasions for meetings, which he didn't keep. He told the vocational experts that he can't work because his doctor says he can't work and that he doesn't have to adhere to restrictions by other doctors. And he said the purpose of job placement was to prove that he couldn't work. The arbitrator and subsequently the commission found that he had not proved that he was permanently and totally disabled, he was not entitled to a wage differential, and awarded him 50 percent loss of use of the person. And the Circuit Court decided he was entitled to a wage differential, correct? That is correct, Judge. And you took an appeal from that ruling? Yes, we did, Judge. And I would point out, though, that briefly, that the issue of wage differential was never raised at trial. It wasn't listed on the court. Did he waive wage differential at trial? Well, that would be my position, Judge. Where did he waive it? Where in the record will we find his waiver? There's not a permanent waiver, but he did not raise it on the stick sheet or at any time during the hearing in front of the arbitrator. That's not what the Supreme Court says. The Supreme Court says wage differential is the preferred method unless it is waived. And admittedly, that might be the weakest of my arguments, Judge, so let me move on to the next. But wait a minute. Yes. That's a very, very important argument. Yes. Because the testimony in this record is he would have been making, if he had his usual occupation, be making $19 an hour. Yes. Then you send him, he goes to MedVac or whatever it is. MedVoc. And they turn around and says that the claimant could be expected to earn a level of $12 to $14 per hour. Well, number one, they say he can't do his old job. Correct. And number two, they say he'd be earning less than his old job. Why isn't that wage differential? Because they also took, the commission also, the arbitrator and the commission also took into consideration Mr. Longmuir's own testimony that if he wasn't disabled, that he could have a good-paying government job. And they made what I think is a reasonable inference that that job would have paid at or more than what the job would have. Where is the evidence of that? There is no evidence. He didn't put forth the evidence. No, no. Where is the evidence? He put forth, there's evidence in the record that number one, he couldn't do his old job. Correct. What the pay was for his old job. Correct. And there is evidence in the record that he could perform these positions and he's expected to get paid $12 an hour. Now, where is your evidence that he could have gotten paid more? Other than his testimony about this good government job that he could get if he didn't feel that he was disabled. What job was that? He didn't identify it. He didn't talk about what the wage was. But isn't it his burden of proof? He did. He proved he couldn't do his old job, $19 an hour. He introduced evidence that the expert said he was capable of doing a job that paid $12 an hour. Now, you're turning around saying, but he doesn't get a wage differential because he said he might have been able to work some high-paying government job that we think would have paid more than $19 an hour. Now, do you think that's really evidence? I don't think it's what we, meaning me, personally felt, but was it a reasonable inference for the commission to draw? Or is it speculation and conjecture? Who got MedVolk involved? That was my office judge. Okay. Your office gets MedVolk involved, and they're the ones who delineated that there was a current job market for someone with his qualifications, what the wages were. Your agency supported his position. Look at what the report says. The position that he didn't raise during the course of the trial, but, yes, it did say the labor market survey did say there were jobs paying from $11 through $17 an hour, and most likely in the $12 to $14 an hour. Well, you stipulated he would have been earning $20 and $29. So basically, MedVolk, did they not support the wage differential? Judge, first of all, I never stipulated that there would be a $20 and $0.29 wage. What I stipulated, too, at the start of the trial was that if he was currently employed in the same capacity as a SADC person, he'd be earning $19 and $0.29 per wage. That's the stipulation I made at the time. So if you take that stipulation and MedVolk's evidence, it does provide evidence of a wage differential award, doesn't it? Absent this, well, I might have got a better-paying job, government job, unidentified. It could. And what does Gaglianetti say? Gaglianetti says that the language of the statute, so long as there's sufficient evidence to demonstrate loss of earning capacity, the commission has no discretion to order a scheduled award. And I also think those cases, though, Judge, also talk about the decision of the commission isn't going to be overturned as being against manifest way to the evidence when they make a decision as to the issue of permanency. That's what we're talking about. We're not talking about it. He's not asking for a permanent total year. What we're asking for here is the entitled wage differential. You say he's not entitled to a wage differential. And we're saying as a matter of law, once there was evidence in this record that he had a loss of earnings, $19 down to 12, as a matter of law, the commission can't award him a scheduled award. They have to give him a wage differential. Judge, and if you believe that the commission's ability to draw an inference that he's not, this government job that he talked about, that he didn't offer any testimony to support that. Hold on, hold on, hold on. This, you kept talking about a government job. Was there ever a mention of how much he could earn in this government job? No, but I. Was there government jobs that pay less than $19 an hour? I assume so. Okay. So was his good government job less than or more than? I don't know, but isn't it his burden of proof to show? No, he did prove. You proved. You proved what he was capable of earning.  You proved it. Were you trial counsel, Moreau? Yes, I was. You had the case since its inception? I've been on this case since 1995, Judge. So when the claimant throws out this gratuitous benefit to you about a government job paying X amount of dollars, did you ask him what government job? I did, and he specifically said in the record that if I wasn't disabled, that due to my connections through the party, that I could get a good government job. But you didn't try and pin him down? I did, but it was considered speculation, and my line of questioning was rejected by the arbitrator. So the speculation below, why isn't the speculation here? Again, I, you know, it's the inference question. To take his statement that if I wasn't disabled, I could get a better paying government job, and equate that to evidence of his ability to earn more than $19 an hour, smacks of guess, speculation, and conjecture, and you can't base a decision on that? Well, and I think part of the problem also during this whole process, Judge, was the commission, the arbitrator, all felt that Mr. Longmuir's behavior throughout the conduct of this case, from the initial trial all the way up through the final trial, was nothing more than an attempt to manipulate the system. Judge Gillespie, when he went through the decision, he indicated the proper standard of review was, was it against the manifest weight of the evidence? There's no dispute that there was a partial incapacity from returning to his usual and customary job duties. He has permanent restriction. He couldn't return to his job at PACT, although I would note that in 1995 or 1996, he was offered a job and never returned to it. So I think they met the first part of the two-pronged galleonetting test. It's really the question goes to, did he show an impairment of his earning capacity? I understand, Justice Hoffman, Justice Hudson, you believe that, you know, my position is speculation and conjecture, or is relying on speculation. No, our position is you supply him with the evidence. MedVac, the testimony of the MedVac expert gave him, gave him the loss of earning capacity. I mean, that was the witness at home. I'll read it for you. There's no question that we supplied that testimony, that we supplied the vocational expert as ordered by the commission, but I do still keep going back to the fact that was the commission, was the arbitrator right in drawing the inference that they did? But, you know, even going beyond that, looking at his claim for permanent and total disability, he's failed to prove that there was medical evidence of a permanent and total disability. There's a difference of opinion among the doctors as to whether he's capable of working, including some of his treating doctors. You can't say he made a diligent and unsuccessful job search. He made no attempt to do a job search. He didn't even apply for a single job. The commission's decision not giving him a wage differential, while he does have to be light on Bose's testimony, correct? In part, yes. Okay. And that supports your position that he shouldn't get a permanent and total award, right? That's correct. Okay. And it comes down to whether there's an impairment of earnings. The commission found that there wasn't an impairment of earnings. Judge Gillespie first applied a de novo standard saying the commission had improperly considered the Gallianetti case and only applied one part of it. Then he said, well, if that's not the proper standard, then it's the decision against the manifest weight of the evidence. He found that it was against manifest weight of the evidence because they ignored the uncontradicted testimony of Julie Bose. I submit to you once again that it wasn't unrebutted. There was evidence about this second job. This is the claimant's cross appeal, right, on the permanent and total. So you'll have a chance to respond unrebutted. Right. Absolutely. And just in summary, I don't think the commission's decision was wrong. I don't think it was. I think you made that eminently clear. Well, thank you. What you don't like is the fact this guy did nothing to get himself a job. Right. In fact, he did zero, but he doesn't have to do anything. It's not what he is earning. It's what he's capable of earning. And I don't think we know for certain what that amount is, even though there is a labor market survey. And I don't think someone who's manipulated the system, who's refused to cooperate, who's refused to ask for vocational rehabilitation and then doesn't participate in it, I don't think he should be rewarded for his conduct. We would respectfully suggest that the decision of the circuit court be reversed and the decision of the commission reinstated. Thank you. Counsel? You may respond. Good morning. My name is Tom Stieberth. I represent Mr. Longmire as an appellee and cross-appellant. In listening to Your Honor's questions this morning, I think that that actually represents the position that we have in this case. On a wage differential? On a wage differential. And unless there's other questions, I can move on to my cross-appeal. And in this particular case, I think it's important to understand that Mr. Longmire was not only operating with a physical disability but also a mental disability where he's diagnosed with depression and he was also diagnosed by the respondent's own medical expert with an underlying psychiatric disorder, which I think played an important role in this particular case. But in looking at the evidence, my focus is primarily on a statement that Ms. Bowes, the vocational rehabilitation counselor made in this case when she initially sat down with the petitioner to evaluate him for purposes of determining whether or not he was an eligible candidate for vocational rehabilitation. She mentioned that in looking at his work experience that there were no transferable skills that could be drawn from his work for the respondent and prior that would carry over into a sedentary-type work category, which was the physical limitation that had been placed upon him by the respondent's doctors. Our own doctors, the treating doctors, felt that he was incapable of returning back to work at all. That is not the point. Let me clarify a point. Didn't Bowes testify, however, that in citing physician opinions that the claimant could perform sedentary work and that working would actually be beneficial to his condition? She did. She adopted. She essentially went with the contradictory opinion of the treaters, or the most recent treaters. There's some reference in the record to Dr. Vargo and Dr. Clark, who were involved in this man's care back in the mid-'90s. So do you concede there is evidence in the record to support the notion he is not permanently and totally disabled? From a medical standpoint, yes. Then how in heaven's name can you say that their decision to deny him is against the manifest way? Because there are other ways of demonstrating it. Well, we know there are other ways, but the fact of the matter is there is evidence in the record to support their decision. And if there is evidence in the record to support their decision, the cases would suggest it's not against the manifest way. Well, and that's where I would differ slightly in terms of was there evidence to support the decision. In particular, I think when you look at the evidence that did support the decision. And this is my focus is very specific on something that Ms. Bowes has concluded in this case. She makes the case that Mr. Longmeier, the petitioner in this case, is able to return back to work, that there are jobs available to him within his restriction. All right. Some type of sedentary job. Some type of sedentary job. And she identifies what those jobs are based upon his skill set. Now, that's where this is the focus of my argument is her understanding of his skill set is clearly wrong and is not supported by the record. And so her opinion is based on a faulty premise. Okay. What is that faulty premise? The faulty premise is that the jobs that she identified, accounts payable clerk, accounts receivable clerk, payroll clerk, were all jobs that seemed to be suited to his experience because he held a position as a treasurer for the King County Democratic Party back in the mid-90s. And when I asked her specifically, well, what were the skills that he developed in that position? Because I understood, and Mr. Longmeier testified regarding what his responsibilities were in that particular volunteer position. Which were what? In brief summary. In brief summary, he essentially went as much as he could, usually once a month, to collect bills, and then he would write checks. He never balanced a checkbook. He never balanced a checkbook in his own life. He had no skills in that regard. What jobs did she say he was suitable to do? Payroll clerk, accounts receivable clerk. Did payroll clerk make bookkeeping entries, or did they just write checks? She indicated that it would be bookkeeping. And in fact, when I asked her about the skills that she thought that he possessed from the treasury position, she indicated bookkeeping, skills like bookkeeping. Mr. Longmeier testified as to exactly what he did in that accounting position. He was a payroll clerk. He was not a payroll clerk. He wrote checks. He did no balancing of any sort of us. But that wasn't my question that you didn't answer. Do people who write checks in companies always do the bookkeeping? Some of them just do nothing but write checks. Many payroll clerks don't do anything but write checks. They don't do bookkeeping. I don't know the answer to that question. It was not something that was mentioned by Julie Bowes. What she indicated is that that particular skill, bookkeeping, would make him suitable to work as a payroll clerk, to work as an accounts receivable clerk. It is her understanding that I'm focused on in terms of indicating that there's no support for her opinion in that regard. And based on that, her opinion is faulty. Well, doesn't she have an opinion that, I mean, he's got a GED, right? I'm sorry? He got a GED. Correct. He has audited classes at NIU, right? Correct. And that he thinks his education demonstrates no opposition to training or education. I mean, doesn't any job have a learning curve and skill sets that are required for the job? You don't bring competency to that job when you show up, but that you learn how they want to do things? Well, I would agree with that statement, that certainly there are things that we all learn. You know, we didn't become lawyers right out of law school. Is there no job where a person just writes checks? Because he admits he did that. When he was the treasurer, he wrote the checks. He collected the bills and wrote the checks. According to what's in this record and what Ms. Bowes indicated that she identified for him, that the bookkeeping was a component of his job. I don't know the answer to your question based on what was said. We're supposed to give deference to the commission's determination because there are supposed to be experts in these fields. Do you think a person who is supposed to be an expert in the field has engaged in some quantum leap when they say if you can sit down and write checks and you can collect the bills, you can work? Do you think that's some kind of a quantum leap when he admits that he writes checks and collects bills? Well, I think that that leap, it wasn't a quantum leap as much as this was something that the respondent's expert said was a necessary component of these positions. Let's set aside for a second. What's your understanding of what a call service representative is? Now, a call service representative, my understanding of that would be that this person is receiving calls from customers for companies, addressing concerns. Okay. Taking down that information in real time. Exactly. And those testified were overlooking this. He could work as an accounts payable clerk or a payroll clerk, and we're going back and forth on what a payroll clerk does. But you also clearly testified he could be a call service representative. That doesn't involve any bookkeeping or balancing of accounts, does it? That does not. So why couldn't he do that? Well, when he was tested in the vocational process, one of the tests that he was administered was a test that attempted to gauge his working memory, which is his ability to retain information in real time and then use it in a critical manner. When a person is working as a call service representative, this is a, and Julie Bowes also indicated, that this is a gentleman who would not be able to perform well in situations that involved him to think quickly. He did not do well on timed tasks. A call service representative is exactly that. I would submit to this Court that when you have a customer on the phone that's either desiring information right away or hot about some issue because they're unhappy with service or a product, that a person has to have working memory. Mr. Long here demonstrated. And where will we find that in the record? It's in the vocational testing that she performed. She also testified. Where will we find in the record what you just told us, that you have to have this working memory, you have to be able to do things immediately? Where will that be found? Well, it's, it's. Where will that be found? It would be found in the, it's a promise that the description of working memory that was provided by Ms. Bowes, also by Mr. Blumenthal, both of whom are certified vocational rehab counselors, their definition of working memory is exactly what I cited to the Court. And nevertheless, though, she said clearly he could be a call service representative. You dispute the level of competency or skill to do that. But the bottom line is, isn't it? She said he could be a, quote, unquote, call service representative. Did she not testify? She did testify to that. It occurs to me that the same argument that you use against the commission finding he could be a payroll clerk or another clerk is exactly the same argument that defeats what you just argued to us on the call service representative. It's a level of competency. It's not that he can't do the job. And the fact that she said it requires bookkeeping, commission could easily find it. Payroll clerk doesn't have to do bookkeeping. Accounts receivable clerk doesn't have to do bookkeeping. It just records what's owed. Let the bookkeeper do the bookkeeping. And the opposite end of the coin on the call service representative is he wouldn't be a real good one, but he could do it. And so I suppose what I'm saying to you is, you know, the fact that there's evidence in the record to support their notion that he is capable of some sedentary work almost defeats your cross-appeal on a manifest weight basis. Yeah, the fact that he's been, that there's been a finding that he can work in a sedentary capacity still, it does move the case into a different category of permanent total disability. And then the question becomes, are there jobs that are available? And my whole premise in this appeal is that the information that Julie Bowes used to develop her opinion that there were jobs available was based on information and an understanding that was wrong. And because that information is wrong, it's my position that the opinion is wrong. And that if that opinion is wrong, then the only opinion comes from Stephen Blumenthal on that issue. Thank you. Thank you, counsel. Counsel, you may reply and engage in rebuttal. Thank you, Judge. Just briefly, the commission specifically found that Mr. Blumenthal's vocational opinions were to be given less weight than that of Ms. Bowes because Mr. Blumenthal just did an interview and just looked at the records of Dr. McGuire, the internist that he's been treating with. He didn't review the records of the other doctors. He didn't do any vocational testing. He didn't review any of the documents from MedVolk when he reached his opinion. So was the commission wrong in relying upon the opinions of Julie Bowes rather than Stephen Blumenthal? I don't think you can say that that decision is against the manifest weight of the evidence. Now, as far as the clerical job, the call center position, these were jobs identified by Ms. Bowes. She testified unequivocally that she felt that he could do those jobs. Mr. Blumenthal, again, his testimony was afforded less weight. And I think that based upon the overwhelming weight of the evidence that you have to affirm the decision that Mr. Longmuir failed to prove that he was permanently and totally disabled. Unless you have any questions. Thank you. Thank you, counsel. Both of your arguments in this matter will be taken under advisement and written to the reasonable issue. Madam Clerk, please.